## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOM SABATANO,<br>on behalf of himself and all others<br>similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>TOM'S OF MAINE, INC. and<br>COLGATE-PALMOLIVE COMPANY,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tom Sabatano ("Plaintiff") brings this Class Action against TOM's of Maine, Inc. ("TOM's") and its parent company Colgate-Palmolive Company ("Colgate") (collectively, "Defendants"), on behalf of himself and all others similarly situated, and alleges the following based on his personal knowledge and the investigation of his counsel:

### INTRODUCTION

1.      This is a consumer Class Action against TOM's, an oral care company, and its parent company, Colgate, for their false advertising, unfair and deceptive marketing practices, and materially misleading claims and omissions they employed and disseminated in connection with the sale of their line of toothpastes containing activated charcoal.

2.      Activated charcoal is highly porous and has adsorptive qualities that can be useful in certain contexts. In recent years, health and beauty products containing activated charcoal have become a consumer sensation. Opportunistic marketers, celebrities and social media influencers tout a variety of activated charcoal products for purported detoxifying properties and other enhanced wellbeing and health benefits. Consumers have been willing to

pay a premium for these charcoal products based on these purported benefits.

3.    In 2006, Colgate-Palmolive purchased TOM's of Maine.[1] TOM's is a brand name and manufacturing company of purportedly "natural" personal care products, including oral care products such as toothpastes and mouth washes.

4.    TOM's promotes itself and its mission as serving its customers "with the highest verified standards of social and environmental performance, transparency, and accountability."[2] TOM's further promotes itself as a "natural" brand to be trusted and relied upon by consumers in connection with their decision-making as to oral health and dental hygiene. Through its marketing campaign, which is ubiquitous and high in volume and content, TOM's conveys a clear message that the brand is extremely conscientious and focused on health and safety. TOM's specifically holds itself out as having standards of "purposeful" and "transparen[t]" inclusion of ingredients, "conform[ing] to the requirements of regulatory authorities", and obtaining "sufficient research to show safety and efficacy" for all of their products.[3]

5.    TOM's sells oral care products containing activated charcoal, including the "Activated Charcoal Toothpaste – Fluoride-Free in Peppermint" toothpaste product ("Fluoride-Free Charcoal Toothpaste") and "Natural Activated Charcoal Toothpaste in Peppermint" toothpaste product ("Fluoride Charcoal Toothpaste") (collectively, "**Charcoal Toothpastes**.")

6.    TOM's actively misleads consumers to believe the Charcoal Toothpastes are safe and "gentle" whitening toothpastes.

---

[1] *See* https://www.tomsofmaine.com/news/colgate-purchasing-toms-of-maine (last accessed December 16, 2020).
[2] "Our Mission." Tom's of Maine, Inc. [https://www.tomsofmaine.com/our-promise/our-mission] (last accessed December 16, 2020).
[3] "Our Stewardship Model." Tom's of Maine, Inc. [https://www.tomsofmaine.com/our-promise/stewardship-model] (last accessed December 16, 2020).

7.     TOM's promotes the Charcoal Toothpastes with multiple claims printed on the product packaging and tube labels of the Charcoal Toothpastes, including: "whitening toothpaste," "gently whitens teeth," "fights cavities," "safe for enamel," and "safe for everyday use."

8.     Indeed, TOM's was well aware that it had duties to uphold as to its marketing, advertising and labeling of the Charcoal Toothpastes. This is in part evidenced by the fact that the Charcoal Toothpastes it develops, markets, and sells are all subject to a legal and regulatory framework over cosmetics and over-the-counter drugs.[4]

9.     TOM's marketing strategy has been very successful, and the Charcoal Toothpastes have become one of the top sellers in its product category. However, that success is built around messaging that is materially misleading and deceptive to consumers, lacks a factual basis, and recklessly omits material information concerning the use of charcoal in oral care.

10.    The consensus of respected dentists, researchers and industry experts weighs *against* the use of charcoal dentifrices, due to the lack of scientific substantiation on safety and efficacy, as well as risks of harm.

11.    Notably, the American Dental Association ("ADA") has not approved *any* charcoal dentifrices for its ADA Seal of Acceptance (the "ADA Seal"). The ADA Seal certifies the safety and efficacy of a dentifrice, based on clinical data and research.

12.    TOM's knew or should have known that its claims regarding the Charcoal Toothpastes were misleading, deceptive, and/or false and lacked a reasonable basis or credible substantiation.

---

[4] Each of the Charcoal Toothpastes qualify as a cosmetic or a combination of cosmetic and over-the-counter drug, under the pertinent legal framework, as explained *infra*.

13.   TOM's also omitted material facts, including that charcoal, when used in toothpastes, is known to be abrasive to enamel and the gums, and to pose risky safety hazards with use.

14.   As a result of TOM's' marketing claims and messaging, Plaintiff and other consumers reasonably and justifiably relied upon and attributed credence and value to the asserted benefits, specifically the safety and efficacy in the "gently whitening" properties of the Charcoal Toothpastes.

15.   As a direct and proximate result of TOM's' misrepresentations, material omissions and deceptive practices in its advertising and labeling, Plaintiff and others similarly situated have suffered actual injuries from their purchase of one or more of the Charcoal Toothpastes, and did not receive the full value of their purchase. TOM's successfully induced Plaintiff and the putative class members to purchase the Charcoal Toothpastes that (i) cannot effectively perform gentle "whitening" functions as represented by TOM's and (ii) are not safe for enamel and everyday use as represented.

16.   Additionally, TOM's charges a price premium for the Charcoal Toothpastes over other toothpastes that do not contain charcoal, including its own non-charcoal toothpastes.

17.   By falsely advertising and misbranding its Charcoal Toothpastes, TOM's prioritizes its own profits and jeopardizes consumers' dental hygiene, oral health and safety. TOM's' conduct in its advertising, labeling, and sale of the Charcoal Toothpastes was, and continues to, be substantially injurious to consumers, as well as unconscionable and in contravention of public policy.

18.   TOM's' false advertising and labeling and materially misleading claims and omissions have enabled it to sell the Charcoal Toothpastes in great quantity.

19.     Defendants' conduct is consumer-oriented and likely to deceive reasonable consumers, and is in violation of New York consumer laws and constitutes unlawful practices in violation of Sections 349 and 350 of New York General Business Law. Defendants' conduct also constitutes a breach of the UCC's express warranties, as well as violations of common law. Defendants were unjustly enriched as result of their misconduct.

20.     Plaintiff brings this proposed Class Action on behalf of himself and other similarly situated consumers in the state of New York who purchased TOM's Charcoal Toothpastes within the relevant statute(s) of limitations period (the "Class"). For the alleged violations of state statutory law and common law, Plaintiff seeks on behalf of himself and the members of the Class, to recover compensatory and statutory damages, treble or punitive damages as available, attorneys' fees and costs, as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and the Plaintiff is a citizen of a state different from at least one Defendant.

22.     This Court has personal jurisdiction over Defendants. Defendant TOM's has sufficient minimum contacts with the state of New York and purposefully availed itself, and continues to avail itself, of the jurisdiction of this New York through the privilege of conducting its business ventures in the state of New York, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Defendant Colgate-Palmolive is a corporation with its principal place of business in New York and is thus subject to personal jurisdiction in New York.

23.    Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendants do business throughout this district, and Plaintiff Sabatano made his purchase of the Charcoal Toothpaste in this district and his purchased product was delivered to, and used, in this district.

## PARTIES

24.    Plaintiff Tom Sabatano ("Plaintiff Sabatano" or "Mr. Sabatano") is a natural person and a citizen of New York, residing in Yonkers. Plaintiff Sabatano purchased the Fluoride Charcoal Toothpaste multiple times within the statutory period, most recently approximately two to three months ago at a Walgreens brick and mortar store in Yonkers, New York. Prior to his purchase, Mr. Sabatano saw and reviewed TOM's advertising claims on the toothpaste packaging and labeling itself, and he made his purchase the toothpaste in reliance thereon. Mr. Sabatano specifically relied upon representations made by TOM's that the toothpaste was safe to use for brushing his teeth and that the toothpaste had safe whitening properties. Mr. Sabatano did not receive the promised benefits or safety, or receive the full value of his purchase.

25.    Defendant, TOM's, is a Maine manufacturing company and a wholly-owned subsidiary of Colgate-Palmolive Company with its principal place of business at 2 Storer Street, Suite 302, Kennebunk, ME 04043. TOM's is licensed with the New York Department of State to conduct business in New York. Defendant is a personal care product company, including oral care products, engaged nationwide in the business of selling toothpastes, dental floss, mouthwash, and related products to consumers from its website, www.tomsofmaine.com, and through the brick-and-mortar and online stores of third-party retailers. TOM's markets, labels, brands and sells the Charcoal Toothpastes throughout New York and the United States.

26.     Defendant Colgate-Palmolive Company ("Colgate") is a Delaware corporation with its principal place of business at 300 Park Avenue, New York, New York, 10022. Colgate-Palmolive company purchased Tom's of Maine in 2006 for $100 million dollars.

27.     In conjunction with Colgate, TOM's markets, labels, brands and sells the Charcoal Toothpastes throughout New York and the United States.

28.     Since each Defendant acted jointly to perpetrate the acts described herein, they are thus subject to joint and several liability. At all times relevant to the allegations in this matter, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency, regarding the acts and omissions alleged.

29.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## COMMON FACTUAL ALLEGATIONS

**A.      Activated Charcoal Historically Has Many Uses, But Not All Are Effective or Safe.**

30.     Activated charcoal is made from coal, wood, coconut shells, sawdust, bamboo, or similar ingredients. The raw material is superheated, treated with different chemicals, and then superheated a second time with steam.[5]

31.     Activated charcoal has adsorptive qualities that have proven to be quite useful in certain limited contexts. For decades, it has been used in the emergency medical treatment

---

[5] "Activated Charcoal FAQ," General Carbon Corp. [http://generalcarbon.com/facts-about-activated-carbon/activated-carbon-faq/] (last accessed December 16, 2020) (General Carbon Corp. is an activated charcoal manufacturer).

of certain types of poisonings and drug overdoses, because, when administered correctly, it can adsorb certain heavy metals, drugs and other toxins.[6] The effectiveness of medicinal activated charcoal in the emergency room setting is limited and dependent on specific factors, such as the type of drug, poison, or toxin, timing between ingestion of the toxin and ingestion of the medicinal charcoal, and dosage of each.[7]

32.    Activated charcoal has also been used in industrial and environmental settings to extract certain organic and in organic substances from water.[8] For example, it is sometimes used to remove excess amounts of fluoride from drinking water.[9] It is used in juice manufacturing to control color and remove organic compounds.[10] Activated charcoal can also adsorb water-soluble vitamins, including forms of Vitamins C and B.[11]

33.    Charcoal was also used in ancient times for human health purposes. The first use of charcoal for oral hygiene dates back to Hippocrates in ancient Greece.[12] The Romans apparently followed this practice, along with other questionable oral care practices such as

[6] See generally, Robert W. Derlet & Timothy E. Albertson, "Activated Charcoal—Past, Present and Future," 145 West J. Med. 493 (Oct. 1986) [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1306980/pdf/westjmed00158-0063.pdf]. (last accessed December 16, 2020).
[7] Id.; see also Derlet & Alberston, supra note 3, at 493–92 & Table 1; Jennifer A. Lowry, "Use of Activated Charcoal in Pediatric Populations," World Health Organization: Subcommittee of Expert Committee on the Selection and Use of Essential Medicines, Jan. 2008, at 2, [https://www.who.int/selection_medicines/committees/subcommittee/2/charcoal_rev.pdf ] (reviewing literature on medical use of activated charcoal). (last accessed December 16, 2020).
[8] See generally "The History of Activated Carbon," Jurassic Activated Carbon, Feb. 9, 2014 [https://www.jurassiccarbon.com/blogs/news/12186281-the-history-of-activated-carbon]. (last accessed December 16, 2020).
[9] Manisha Poudyal & Sandhya Babel, "Removal of Fluoride using Granular Activated Carbon and Domestic Sewage Sludge," 82 Int'l Proceedings of Chem., Biological, and Envtl. Eng'g 139 (2015) [http://www.ipcbee.com/vol82/027-IEEA2015-C3024.pdf]; see also Behrooz Eftekhar et al., "The Effectiveness of Home Water Purification Systems on the Amount of Fluoride in Drinking Water," J. of Dentistry, Shiraz U. of Med. Sci., Sept. 2015, at 278, (noting that use of home water purification systems, including several using carbon-based filtration methods, reduced the amount of fluoride in water). (last accessed December 16, 2020).
[10] Cetin Kadakal et al., "Research Note: Effect of Activated Charcoal on Water-Soluble Vitamin Content of Apple Juice," 27 J. of Food Quality 171 (Apr. 2004) [https://doi.org/10.1111/j.1745-4557.2004.tb00647.x]. (last accessed December 16, 2020).
[11] Id.
[12] See S.W.B. Newsom, "Hygiene and the Ancient Romans," J. of Infection Prevention, at 25, June 2004 [https://journals.sagepub.com/doi/abs/10.1177/14690446040050030601]. (last accessed December 16, 2020).

rinsing their mouths with urine.[13]

34.    In the modern age, inspired by the use of activated charcoal in these limited and particular contexts, enterprising companies like Defendants have been eager to extrapolate charcoal's adsorptive properties for use in a much broader context, often with little to no substantiation. Products containing activated charcoal are increasingly prevalent and are promoted with false, deceptive, or overstated health and beauty benefits. Activated charcoal has been marketed to the public as capable of extracting nearly any undesirable element or substance, and in nearly any context.

35.    Multiple scientific and consumer publications have made note of the misleading health and safety benefits of charcoal (particularly in its most commonly available form as an ingestible supplement). Notable excerpts include:

- "In recent years, people have tried to translate the very limited success of activated charcoal in the ER to their everyday lives, assuming that if it can adhere to and remove certain drugs in an emergency room, it can stop all kinds of toxins, making an already healthy person even healthier."[14]

- Lisa Sasson, M.S., R.D., clinical associate professor of nutrition at New York University is quoted as saying "**this logical leap is not based in science.**"[15]

36.    Simultaneous with the charcoal trend, consumer demand for teeth-whitening

---

[13] C. Valerius Catullus, "On Egnatius of the White Teeth," circa B.C. 84–54, (Tr. Richard Francis Burton, 1894), [http://www.perseus.tufts.edu/hopper/text?doc=Perseus:text:1999.02.0005:poem%3D39] (poem by the Roman poet Catullus referring to the practice of whitening teeth by rinsing with urine). (last accessed December 16, 2020).
[14] Julia Calderone, "Activated Charcoal Isn't a Magic Health Bullet," Consumer Reports (April 13, 2017) [https://consumerreports.org/dietary-supplements/activated-charcoal-fad-not-a-magic-health-bullet/]. (last accessed December 16, 2020).
[15] *Id.*

products has risen. The global market for teeth-whitening products is expected to reach $7.4 billion by 2024.[16]

37.     TOM's has successfully leveraged the charcoal trends as well as consumer enthusiasm for teeth whitening with its development, marketing, and sales of its Charcoal Toothpastes, stating in plain language on their packaging: "Activated charcoal adds a gentleness benefit to our whitening formula."

**B.     Activated Charcoal is Unsafe By Modern Scientific and Regulatory Standards.**

**1.     Contemporary studies challenge the safety and efficacy of activated charcoal for use in dentifrice.**

38.     In the United States, there have been several attempts to introduce charcoal as an oral health product. According to commentary published in the Journal of the American Dental Association ("JADA") in 1932, a product named "Kramer's Original Charcoal Dental Cream," had been pronounced "not acceptable" as an Accepted Dental Remedies (ADR) by the Council on Dental Therapeutics (the "Council"). The Council found that "[c]linical experiences are recorded in which the particles of charcoal became imbedded in the gum tissue and produced a bluish line near the margin, which is removable only by surgical means."[17] When the Kramer's brand produced no evidence to rebut the clinical results, the Council denied it as an ADR "because it is a dentifrice intended for daily use that contains **charcoal, a potentially harmful substance**."[18]

39.     Decades after American dentistry rejected charcoal for use in dentifrice, the

---

[16] https://www.hexaresearch.com/research-report/teeth-whitening-products-market.
[17] John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 JADA 785 (2017), [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)).
[18] *Id.* (emphasis added).

topic has again resurfaced, in light of the burgeoning consumer trend. One study, presented at the Academy of General Dentistry 2015 Annual Meeting, concluded that "activated charcoal was more abrasive than a whitening toothpaste on acrylic resins" and warned that "[t]he fine black charcoal powder may become embedded in defects such as margins or cracks present on older dentition."[19]

40.    In 2017, the Journal of the American Dental Association published a literature review to "examine the efficacy and safety of charcoal and charcoal-based dentifrices." John K. Brooks et al., *Charcoal and Charcoal-Based Dentifrices*, 148 JADA 661 (2017) (referred to herein as "*Charcoal-Based Dentifrices* (JADA 2017)" or "the 2017 JADA article"). The authors, Dr. John Brooks, DDS, Dr. Nasir Bashirelahi, PhD, and Dr. Mark A. Reynolds, DDS, PhD, reviewed the first 50 consecutive charcoal dentifrices from Google.com and Amazon.com to assess how the marketing claims of these products compared with efficacy and safety of charcoal-based dentifrices as found in the available scientific literature.[20]

41.    The findings of the 2017 JADA article state that there is no scientific support for a "detoxifying" effect of charcoal[21]; it is abrasive on teeth and gingiva[22]; and any inclusion of fluoride for health is counteracted and rendered moot by the inclusion of charcoal[23].

42.    In short, there was little evidence that charcoal-based toothpastes offered any cosmetic or health benefits and were as safe as marketers touted.[24]

---

[19] Brantley McCarty et al., "Activated Charcoal as a Whitening Dentifrice," Presented at Academy of General Dentistry 2015 Annual Meeting, June 18–21, 2015, San Francisco, CA [https://www.epostersonline.com/agd2015/node/72] (last accessed December 16, 2020).
[20] John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[21] *Id.* (emphasis added). The authors were unable to identify any randomized, controlled clinical trials with a follow-up duration of 3 months or longer testing the safety or effectiveness of charcoal-based dentifrices. All of the available studies lacked adequate controls to measure clinical oral improvements with charcoal-based dentifrices.
[22] *Id.* (emphasis added).
[23] *Id.* (emphasis added).
[24] *Id.* (emphasis added).

43.    A later publication in May 2019 in the British Dental Journal confirmed that supporting scientific evidence remained lacking, and again raised the same and similar concerns reflected in the 2017 JADA article. Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 BDJ 697, 698 (2019) (referred to herein as "*Charcoal-Containing Dentifrices* (BDJ 2019)" or "the 2019 BDJ article").

44.    The 2019 BDJ article considered charcoal dentifrices to be a "gimmick"[25] and said that marketing of such products was "worrying." [26]

45.    The conclusions of the 2019 BDJ article about dentifrices containing charcoal mass marketed to the public are neatly summed up by the following:

> "[T]he ethics of such an approach to the marketing of health-influencing products is at best questionable. False and deceptive messaging, together with the selective provision of information could be classed as misleading practice, contrary to the consumers' best interests and protection."[27]

**2.    The American Dental Association has Not Approved any Activated Charcoal Dentifrice for its ADA Seal of Acceptance.**

46.    The American Dental Association ("ADA") was founded in 1859.[28] Per the ADA's description of its mission, the ADA "exists to power the profession of dentistry and to assist our members in advancing the overall oral health of their patients."[29] ADA presents itself as a "strong advocate[] for public health" working with an aim to keep patients "healthy from the dental chair to daily care at home." [30]

47.    In furtherance of the ADA's public health goals, the organization administers

---

[25] Linda H. Greenwall *et al*., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, 698 (2019).
[26] *Id.*
[27] *Id.* (emphasis added).
[28] https://www.ada.org/en/about-the-ada/ada-history-and-presidents-of-the-ada (last accessed December 16, 2020).
[29] https://www.ada.org/en/about-the-ada (last accessed December 16, 2020).
[30] *Id.*

the ADA Seal of Acceptance Program ("Seal Program"), which began in 1931.[31] The ADA established its Seal Program to combat "extravagant claims" about what dental products could do.[32] Since that time, the ADA Seal of Acceptance has become "[u]niversally recognized by consumers as a symbol of safety and effectiveness" and "is carried on more than 300 oral health products, including toothpastes, toothbrushes, dental floss, mouth rinses, denture adherents, and chewing gum."[33]

48.    Significantly, the ADA has not granted the ADA Seal of Acceptance to any product with activated charcoal, including the Charcoal Toothpastes.[34]

49.    However, TOM's *has* received the ADA Seal of Acceptance for other oral care products it has developed, marketed and sold to consumers, including the following products: "TOM's of Maine Alcohol-free/Natural Children's Anticavity Fluoride Rinse (Silly Strawberry)," "TOM's of Maine Naturally Waxed Antiplaque Flat Floss (Spearmint)," "TOM's of Maine Children's Gel Fruitilicious," "TOM's of Maine Natural Fluoride Toothpaste for Children (Silly Strawberry, Outrageous Orange Mango)," "TOM's of Maine Natural Wicked Cool! Fluoride Toothpaste," "TOM's of Maine Simply White Clean Mint Toothpaste," and "TOM's of Maine Simply White Sweet Mint Gel Toothpaste."[35]

50.    Based upon the prevailing scientific literature regarding the lack of substantiation on safety and efficacy of activated charcoal in dental products, and the known risks and abrasiveness of charcoal, coupled with TOM's' prior experience with the ADA Seal

---

[31] https://www.ada.org/en/science-research/ada-seal-of-acceptance (last accessed December 16, 2020).

[32] https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "What is the ADA Seal?" (last accessed December 16, 2020).

[33] https://www.ada.org/en/about-the-ada (last accessed December 16, 2020).

[34] *See* https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed December 16, 2020).

[35] https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed December 16, 2020).

Program, TOM's was or should have been aware of the unsuitability of the ADA Seal of Acceptance for its Charcoal Toothpastes. Nevertheless, it has chosen to make the exact sort of false, deceptive, and/or misleading claims that inspired the creation of the ADA's Seal Program.

**C.      TOM's Knowingly Misleads Consumers with Misrepresentations Concerning Safety and Efficacy in its Charcoal Toothpastes.**

**1.      TOM's Representations on the Charcoal Toothpastes' Labeling, Packaging, Advertising, and Marketing.**

51.    Since at least 2019, TOM's has packaged, marketed, distributed, and sold some or all of its TOM's Charcoal Toothpastes. Examples of the external cardboard boxes, product packaging and tubes include:





52.    The above packaging bears representations right on the Charcoal Toothpastes' front label such as "gently whitens teeth," "safe for enamel," "safe for everyday use," and "fights cavities."

53.    Printed on the external cardboard packaging of the Charcoal Toothpastes is the following:



54.    The printed text found on the left side of the back of the packaging on the Fluoride-free Toothpaste states:

> "**ACTIVATED CHARCOAL**
> TOM's of Maine Activated Charcoal toothpaste, with naturally derived silica and activated charcoal, is designed to gently clean and restore your teeth to their natural color. It fights tartar build-up with regular brushing, and is safe for enamel and everyday use. Activated charcoal adds a gentleness benefit to our whitening formula. The cool sweetness of peppermint freshens breath."

55.    Featured predominantly in the printed labeling of the tubes and cardboard

packaging for the Charcoal Toothpastes is the claim: "safe for enamel | safe for everyday use**.**"

56.    The following claims are printed on the external cardboard packaging and tube of both Charcoal Toothpastes:

- **"gently whitens teeth**"

- **"safe for enamel**" or **"safe for everyday use**"

- **"Activated charcoal adds a gentleness benefit to our whitening formula.**"

57.    On its website, TOM's makes the following claims regarding both toothpastes, as well as the purpose and benefits of activated charcoal in its oral care products:

- "Gently whiten teeth the natural way with our new Activated Charcoal Toothpaste."[36]
- "Best of all, it's been specially crafted for everyday use to be safe and gentle on your enamel, based on RDA testing."[37]
- "Experience how gentle charcoal toothpaste can be. Embrace the dark with natural toothpaste that gently whitens teeth, is safe for enamel and safe for everyday use."[38]

58.    TOM's' website also includes a short article titled "How Does a Charcoal Toothpaste Whiten Teeth?" written by Maureen Wise.[39] Ms. Wise is an unidentified and apparently uncredentialed contributor who has published a blog on TOM's' website in support of their Charcoal Toothpastes. Ms. Wise specifically lauds TOM's specific charcoal formula as being the "gentlest:"

> "Don't be afraid of the dark! TOM's of Maine's Peppermint Activated Charcoal Toothpaste's formula is the gentlest charcoal toothpaste among leading natural brands based on RDA testing. It is also safe for enamel and everyday use. TOM's of Maine's natural charcoal toothpaste gently whitens teeth by removing surface stains."

---

[36] https://www.tomsofmaine.com/products/oral-care/fluoride-free-activated-charcoal-toothpaste (last accessed December 16, 2020).
[37] *Id.* (last accessed December 16, 2020).
[38] *Id*. (last accessed December 16, 2020).
[39] https://www.tomsofmaine.com/good-matters/natural-products/how-does-charcoal-toothpaste-whiten-teeth (last accessed December 16, 2020).

2.    **The Claimed Benefits of the Charcoal Toothpastes are Materially Misleading and are Debunked or Unsubstantiated by Scientific Evidence, Impossible, and/or Untrue.**

(i)    *TOM's Charcoal Toothpastes are Not Safe for Everyday Use.*

59.    On its website, TOM's states: "Best of all, it's been specially crafted for everyday use to be safe and gentle on your enamel, based on RDA testing."[40] In addition to "Embrace the dark with natural toothpaste that gently whitens teeth, is safe for enamel and safe for everyday use."[41] TOM's bombards consumers with 'friendly' and 'natural' messaging intended to leave a strong impression that the brand is *extremely* conscientious of health, safety and wellbeing. TOM's presents its Charcoal Toothpastes as "natural toothpaste that's safe for enamel and everyday use," "specially crafted," and also free of numerous ingredients that are increasingly considered undesirable or unnatural (such as sls/sulfates, parabens, and BPA).[42]

60.    While proclaiming that the Charcoal Toothpastes are gentle and safe for daily long- term use, TOM's also fails to disclose material facts, such that activated charcoal has *not* been substantiated as safe and effective for use in dentifrice, and both JADA and the BDJ have confirmed insufficient scientific evidence to substantiate safety claims (as well as cosmetic and health benefits) as well as raised concerns about risks associated with the use of charcoal dentifrices.

61.    Activated charcoal is known to be a highly abrasive and harmful substance to tooth enamel.[43] Multiple scientific studies have noted its abrasiveness presents a risk to enamel

---

[40] https://www.tomsofmaine.com/products/oral-care/activated-charcoal-toothpaste and https://www.tomsofmaine.com/products/oral-care/fluoride-free-activated-charcoal-toothpaste (last accessed December 16, 2020).

[41] https://www.tomsofmaine.com/ (last accessed December 16, 2020).

[42] "SLS-free; No artificial flavors, colors, or preservatives; No animal ingredients; Not tested on animals." https://www.tomsofmaine.com/products/oral-care/activated-charcoal-toothpaste and https://www.tomsofmaine.com/products/oral-care/fluoride-free-activated-charcoal-toothpaste (last accessed December 16, 2020).

[43] *See, e.g.*, John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148

and gingiva in the context of oral care products. As noted in the 2017 JADA article: "[c]harcoal has been recognized as an abrasive mineral to the teeth and gingiva, and its inclusion in tooth preparations raises concern about damages to these oral structures, as well as increasing caries susceptibility due to the potential loss of enamel."[44] The 2019 BDJ article again noted the risk to enamel and gingiva posed by charcoal's abrasiveness.[45]

62.    Moreover, the abrasive damage to tooth enamel caused by charcoal can set the stage for spiraling into additional oral health issues. It has been shown that increased surface roughness of teeth creates an environment conducive to increased bacteria in the oral cavity. This, in turn, can lead to other problems and is correlated with high caries and periodontal disease.

### (ii)    TOM's Charcoal Toothpastes Can Not Gently Whiten Teeth.

63.    TOM's' whitening claims for the Charcoal Toothpastes (made on its product packaging, labeling, marketing and advertising) include but are not limited to: "whitening toothpaste," "gently whitens teeth," "our whitening formula."

64.    When a toothpaste or toothpowder is advertised as "whitening," most reasonable consumers believe it will leave their teeth whiter. However, dentists and researchers have warned that charcoal dentifrice companies' "whitening" claims are misleading, due to the failure to clarify the distinction between intrinsic and extrinsic whitening mechanisms. Intrinsic whiteners affect the color of the underlying dentine beneath the enamel; extrinsic whiteners merely offer a temporary fix by removing surface stains.[46]

---

*JADA* 785 (2017) [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)) (Concluding a charcoal dental cream was not an acceptable dental remedy "because it is a dentifrice intended for daily use that contains charcoal, a potentially harmful substance").

[44] John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

[45] Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019).

[46] Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental J.* 697, 699 (2019).

65.     This is misleading and deceptive. Charcoal functions as an abrasive agent. Its composition and fractal-shaped particles make it highly abrasive to tooth enamel.[47] As such, any extrinsic stain-lifting that could be viewed as "whitening" is achieved simply by mechanical abrading of extrinsic stains, and is *not achieved from adsorptive qualities of the charcoal*; rather it is achieved by the *particularly abrasive effects of the charcoal*.

66.     Put another way, the Charcoal Toothpastes "work" to "whiten" teeth through abrading away the stains and deposits, by having the charcoal particles scrape them off the surface of the teeth, i.e. the tooth enamel. The adsorptive qualities of charcoal are irrelevant in the context of purported teeth whitening, and TOM's' representations in this regard are misleading and deceptive.

67.     Abrasive ingredients are commonly used in dentifrice and function to mechanically lift extrinsic stains, reduce the adhesion of dental biofilms and chromophores from the enamel surface, and otherwise improve discoloration and clean the teeth. However, there are numerous commonly accepted and widely used abrasives that are effective and more gentle than charcoal, and have undergone clinical testing as well as ADA scrutiny. There are no long-term clinical studies of the effects of its use, and charcoal (which is particularly abrasive due to its unique particle shape and composition) is not in the ADA-approved list of abrasives.

68.     Lastly, and arguably at worst, consumer experience and dental expert opinions alike indicate that long-term use of the TOM's Charcoal Toothpastes could potentially result in a darkened and yellow tooth appearance. This is because, when teeth are regularly brushed with highly abrasive substances such as charcoal, the enamel can wear down and cause the tooth's

---

[47] *See, e.g.,* Matthias Epple et al., "A Critical Review of Modern Concepts for Teeth Whitening," 79 *Dentistry J.*, 7 (Aug. 1, 2019) [https://www.mdpi.com/2304-6767/7/3/79/htm].

dull, internal dentin to show through.[48] Furthermore, the removal of enamel by abrasive whitening dentifrices not only exposes the yellowish dentin, but also causes teeth to stain even more easily in the future – with the sensitive dentin exposed and no longer protected by enamel.

**D.    TOM's Knew or Should Have Known its Material Claims and Omissions on Oral Hygiene Benefits and Safety were Misleading, Deceptive and/or False.**

77.    TOM's' Charcoal Toothpastes are subject to a federal legal and regulatory framework concerning the marketing, advertising, branding, and labeling of drugs and cosmetics. (Toothpastes and other dentifrices are classified as cosmetics, drugs, or a combination thereof.). As a purveyor of regulated oral care products, making various claims as to safety, oral health, cosmetic effects, and even some medicinal and disease-prevention claims, TOM's knew or should have known of its duties under such regulations. Indeed, as previously discussed, TOM's has undergone the rigorous process to obtain an ADA Seal on some of its products (but has not done so for any of its charcoal products). Many of TOM's' misleading and deceptive practices as to the Charcoal Toothpastes were prohibited by federal and state regulations, of which TOM's was certainly aware.

78.    The Federal Trade Commission Act (15 U.S.C. § 41 *et seq*.) ("FTC Act"), as well as the Federal Food, Drug and Cosmetic Act (21 U.S.C. §321 *et seq*.) ("FD&C Act"), the Fair Packaging and Labeling Act (15 U.S.C. §1451 *et seq*.) ("FP&L Act") and the regulatory frameworks and rules created thereunder impose obligations on marketers and distributors such as TOM's. These federal laws were created in the aim to protect consumers from unfair and deceptive practices (including unsafe or deceptively labeled or packaged products), as well as to protect against unfair competition. Similarly, multiple state laws have statutes that

---

[48] *See* "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

incorporate and/or mirror pertinent portions of federal regulatory framework.

79.    In this pleading, Plaintiff acknowledges TOM's' obligations and duties under this federal framework and under parallel state frameworks for purposes related to the elements of the common law and state statutory causes of action asserted herein (such as the existence of various legal duties and obligatory standards of care, the existence of a special relationship, as well as to underscore that TOM's knew or should have known of its noncompliance and that its conduct was wrongful). Plaintiff expressly disclaims any attempt to hold TOM's to a higher standard than that which is required under federal law, and does not seek relief or remedy for conduct to a standard exceeding that which is required under federal law.[49]

80.    Defendant TOM's was, or should have been, aware of its obligations under the above- described legal and regulatory framework; yet, TOM's appears to have disregarded its duties as to claim substantiation, safety, marketing and advertising, as well as to product packaging and labeling. This further underscores that it knew or should have known its acts and practices were also unlawful under state consumer protection laws.

81.    Defendant TOM's also knew, or should have known, that the Charcoal Toothpastes did not possess the promised benefits and safety, and that there was risk of harm. Scientific studies and journals that contradicted many of TOM's' claims were published and available to TOM's at the time it disseminated its claims and marketing content.

82.    Moreover, TOM's would not have even had to look to academic or scientific

---

[49] The allegations concerning conduct that violates the FD&C Act, the FTC Act, regulations thereunder, and/or other parallel state laws and regulations, as raised herein, are properly asserted in the context of the causes of action and relief sought herein and are not barred by preemption. *See, e.g., Reid v. GMC Skin Care USA Inc.,* No. 15-CV-277, 2016 WL 403497, *10 (N.D.N.Y. Jan. 15, 2016) ("Plaintiffs' claims, if proven to be true, would simply require Defendant to truthfully state the efficacy of its products or not sell its products; such relief would not impose a state requirement that is different from or in addition to, or that is otherwise not identical with that of the FDCA.").

resources, because the scientific findings were also reported in consumer reports and mainstream media outlets both before and during the time the Charcoal Toothpastes were developed, marketed and sold. Examples include:

- ABC News, June 2017, *How Safe is Activated Charcoal?* reports concerns of Dr. Upen Patel, D.D.S., because charcoal dentifrices are not evaluated by the ADA for long term use, can erode enamel, abrasiveness, gums, and tissue, and the small charcoal particles "can get stuck in your gums and in small cracks in your teeth, so you can have these little black lines in your gums and your teeth you can't get out."[50]

- BBC, May 2019, *Charcoal Toothpastes 'don't whiten teeth,'* cited the British Dental Journal for the premise that "charcoal-based toothpastes, which claim to whiten teeth, are a 'marketing gimmick' which could increase the risk of tooth decay," and are "more abrasive than regular toothpastes, potentially posing a risk to the enamel and gums." The article quoted Dr. Greenwall-Cohen as stating that charcoal particles in toothpastes can "get caught up in the gums and irritate them," and also be problematic for fillings.[51]

- Harper's Bazaar, August 2018, *Is Charcoal Toothpaste Safe to Use*? (re-published in September 2020), reported on the doubts and issues raised by the British Dental Journal, noting, "[u]nlike your liver and kidneys, the teeth and gums don't perform a detoxifying function of the body, and since so-called toxins aren't generally hanging out in your mouth anyway, there's not much point in using your tooth cleaning to purge them."[52]

- Dr. Ada Cooper, DDS, spokesperson for the American Dental Association, warned of charcoal toothpastes in *Beware Whitening Promise of Charcoal Toothpastes* in March 2019: "Just because something is popular doesn't mean it's safe." "Charcoal is recognized as an abrasive material to teeth and gums." "Using materials that are too abrasive can actually make your teeth look more yellow, because it can wear away the tooth's enamel and expose the softer, yellower layer called dentin."[53]

83.     It is entirely implausible that Defendant TOM's, a major oral care company that possessed particularly sophisticated marketing savvy and invested significant time, money and

---

[50] Irene Cruz, "How Safe Is Activated Charcoal?," ABC 10 (June 9, 2017) [https://www.abc10.com/article/news/local/how-safe-is-activated-charcoal/447456019].
[51] "Charcoal Toothpastes 'don't whiten teeth,'" BBC: Health, May 10, 2019 [https://www.bbc.com/news/health-48216116].

[52] Lauren Hubbard & Alexandra Tunell, "Is Charcoal Toothpaste Safe to Use?," Harper's Bazaar, Aug. 14, 2018 (updated: Harper's Bazaar Staff, "Is Charcoal Toothpaste Safe to Use?," September 23, 2020) [https://www.harpersbazaar.com/beauty/health/advice/a3764/charcoal-toothpaste-pros-cons/].
[53] The Family Dental Center, Mar. 2019, "Beware Whitening Promise of Charcoal Toothpastes," [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

effort into the marketing of its products, failed to notice reported concerns from the ADA and other dental professionals and experts, researchers within the scientific community, and the media that the safety and efficacy of charcoal dentifrices were wholly unsubstantiated, and their use was highly risky to consumers' oral health and dental hygiene. (Unlike consumers, whose attention to the claims of the oral care industry will likely be limited to time in a shopping aisle looking at product packaging, or at online retail sites that present a company's marketing claims.)

84.    Indeed, TOM'S was under a continuing duty to warn if its product poses a risk, and its duty could be triggered by new information.

**E.    TOM's Intended Consumers' Reliance and Induced Consumers' Purchase of the Charcoal Toothpastes.**

85.    TOM'S' advertising and marketing scheme was constructed in order to induce consumers, including Plaintiff, to purchase the Charcoal Toothpastes over other products, and to do so at a price premium.

86.    The claims at issue – which are alleged herein as misleading, inaccurate, and/or false, as well as lacking a proper factual basis and required evidentiary substantiation – are material to a consumer's decision whether to purchase them. TOM'S recklessly and/or intentionally fails to disclose material information that, if known to a consumer, would inform their perception of the claims affirmatively made, and would affect the purchase decision. The misrepresentations and omissions also have potentially serious consequences on consumers' oral health and dental hygiene, simply as a result of the intended use.

87.    TOM'S sought to instill consumer trust and confidence with terms like "specially crafted," and "the natural way." TOM'S made many claims relating to health, safety and overall oral health, which it knew average consumers were unequipped to assess, and were

relying on and placing their trust in. TOM's persistently claimed superiority over other brands in terms of quality and safety of ingredients, and "giving generously."

88.    TOM's charges more for its Charcoal Toothpastes than it does for TOM's other non- charcoal toothpastes. Through third-party retailers, TOM's charges $4.79 - $5.39 per 4.7-ounce tube of non-charcoal toothpaste. The Charcoal Toothpastes are sold at $5.99 per 4.7-ounce tube.[54]

89.    TOM's continues to promote and hype the (unsubstantiated) attributes of activated charcoal. It does so despite warnings from dentists and the scientific community about charcoal dentifrices – at best a "marketing gimmick" and, at worst, harmful to teeth, dentistry implants and overall oral health.

90.    TOM's' misleading claims, material omissions, and its false and deceptive marketing campaign as a whole, are materially misleading and likely to deceive (and have deceived) consumers, and are intended to induce reliance and the purchase of one or more of the Charcoal Toothpastes.

**F.    Consumers' Reliance on TOM's' Misrepresentations was Reasonable and Justified.**

91.    Each and every purchaser of the TOM's Charcoal Toothpastes, including Plaintiff Sabatano and putative Class members, were exposed to Defendants' claims. In addition to online and print marketing and ads, the claims are printed on external cardboard packaging and product labeling.

92.    Consumers reasonably relied on the oft-repeated claims that the Charcoal Toothpastes had gentle and safe whitening properties, as well as other dental hygiene and cosmetic benefits; that they were safe for enamel, safe for everyday use, as well as generally

---

[54] https://www.target.com/p/tom-39-s-of-maine-charcoal-fluoride-free-toothpaste-4-7oz/-/A-75662888

24

effective, appropriate, and adequate for dental hygiene maintenance; and, at least not harmful in their intended use.

93.    Plaintiff, putative Class members, and consumers at large have been harmed by TOM's' false, misleading and deceptive representations because they purchased the TOM's Charcoal Toothpastes that were not as represented, in that they did not provide the promised benefits, properties, and characteristics, as well as a level of safety. They were also ineffective as dentifrice and/or harmful.

94.    Plaintiff and purported class members paid a premium price for the mislabeled and falsely advertised products, and such premium can be directly and clearly tied to the inclusion of the activated charcoal ingredient, and the hyped marketing claims TOM's made about its attributes. The premium would not have been paid but-for TOM's' misrepresentations on the unproven and harmful ingredient - charcoal.[55]

95.    In addition to the economic injury in the form of a price premium paid for falsely promised benefits, consumers have been damaged by the total purchase price, because they purchased a dentifrice that does not provide the basic safety and oral health maintenance that otherwise similar non-charcoal dentifrices do.

96.    Consumers were damaged by the entire cost of a tube of toothpaste that was ineffective at maintenance of oral hygiene and potentially deleterious to oral health. In addition to its trusting consumers, TOM's took unfair advantage of its competitors. It conveyed that the Charcoal Toothpastes were of such premium, superior quality and had attributes that other commercially available toothpowders do not.

---

[55] Each consumer has been exposed to the same or substantially similar misleading and unlawful practices and each product contains identical or substantially similar claims, and each of the Charcoal Toothpastes were sold at a price premium. As such, each consumer suffered the same or substantially similar injuries as Plaintiff, irrespective of which particular Charcoal Toothpaste they purchased.

97.    TOM's has collected substantial profits as a result of numerous material omissions and false and misleading claims over the benefits and safety of activated charcoal in dentifrices and the Charcoal Toothpastes, and other purported attributes that were false and misleading.

98.    Defendants should not be permitted to retain their substantial benefit obtained from their injurious misconduct, which in justice and equity belong to Plaintiff and members of the Class, and caused them injury; nor should Defendants, in justice and equity, be permitted to continue to benefit from their unfair and deceptive practices.

99.    Without remedy (including injunctive relief), Plaintiff, members of the putative Class, and other consumers, will suffer a concrete harm, in that they cannot be confident that the labeling of products will be truthful and not misleading when they are making their purchase decisions in the future. Alternatively, they might mistakenly but reasonably believe that the labeling and advertising of the products has been substantiated and/or corrected, and be deceived yet again into purchasing one or more of the products.

100.    Indeed, Plaintiff would continue to purchase the Charcoal Toothpastes in the future if the misleading labeling is corrected or the manner in which the Charcoal Toothpastes are manufactured is changed. Indeed, Plaintiff wishes to be able to continue purchasing Defendants' Charcoal Toothpastes, and thus wishes to see the Charcoal Toothpastes truthfully advertised. Moreover, Plaintiff is aware that proposed Class Members are currently purchasing, and will continue to purchase, the Charcoal Toothpastes, unaware that Defendants' front label claims are false and deceptive, unless Defendants' conduct is enjoined.

**G.    Plaintiff Relied Upon the Charcoal Toothpastes' Labels to Purchase and Use the Charcoal Toothpastes.**

101.    Mr. Sabatano relied on the marketing and packaging that represented activated

charcoal as having unique properties that added a special value, and he would not have purchased the Charcoal Toothpaste but-for the fact that it contained activated charcoal, the inclusion and purported benefits for which he paid a price premium.

102.    Mr. Sabatano expected that the Charcoal Toothpaste would meet TOM's' own representations (made on the product itself and online), including but not limited to that it would safely whiten teeth, that it would be safe for enamel, and safe for everyday use and overall oral health.

103.    He chose the Charcoal Toothpaste because of TOM's' particular emphasis on safe ingredients, as he wanted to avoid products containing damaging ingredients like sulfates. He expected that the Charcoal Toothpaste would safely meet dental hygiene and oral health care needs.

104.    However, after a period of use, Mr. Sabatano's expectations concerning the safety of the Charcoal Toothpaste was not met. TOM's. For example, rather than safely whitening his teeth, the Charcoal Toothpaste was actually abrading his enamel, and is not safe for use.

105.    Mr. Sabatano has standing to assert claims on the Fluoride-Free Charcoal Toothpaste, because the products are nearly identical, and TOM's' claims, omissions, and conduct as to his product are substantially similar as to the Fluoride-Free Charcoal Toothpaste, as are the injuries suffered by others as a result of the deceptive labeling and advertising.

106.    Plaintiff suffered the out-of-pocket purchase price for a falsely advertised and misbranded dentifrice(s). His payment also reflects and included a price premium over other products sold by TOM's that do not contain charcoal. The Charcoal Toothpaste purchased by Plaintiff did not and could not deliver the promised whitening benefits and lacked the

represented level of safety, and use of the Charcoal Toothpaste poses some risk and is potentially detrimental to oral health and aesthetics.

## CLASS ACTION ALLEGATIONS

107.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

108.    Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to CAFA and Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed Classes:

> **National Class:** All persons or entities within the United States who purchased one or more of TOM's' Charcoal Toothpastes[56] for personal use from the beginning of any applicable limitations period through the date of preliminary approval (the "National Class" or the "Class").

> **Consumer Fraud Multi-State Class:** All persons or entities in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Washington and Wisconsin who purchased one or more of TOM's' Charcoal Toothpastes for personal use from the beginning of any applicable limitations period through the date of preliminary approval (the "Consumer Fraud Multi-State Class").

> **New York Sub-Class:** All persons or entities in New York who purchased one or more of TOM's' Charcoal Toothpastes for personal use from the beginning of any applicable limitations period through the date of preliminary approval (the "New York Sub-Class").

109.    Excluded from the proposed Classes are the Defendants, and any entities in which the Defendants have a controlling interest, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and Plaintiff's counsel, their staff

---

[56] As previously defined herein.

members, and their immediate family.

110.    Plaintiff reserves the right to amend the Class definitions or add a Class if discovery and/or further investigation reveal that the Class definitions should be narrowed, expanded or otherwise modified.

111.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

112.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the thousands to hundreds of thousands. The number of members of the Classes is presently unknown to Plaintiff but may be ascertained from Defendants' books and records.  Members of the Classes may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

113.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Classes. and predominate over questions affecting only individual members of the Classes. Such common questions of law or fact include, but are not limited to, the following:

    a.    Whether, in their product packaging, labeling, marketing, advertising, and/or sale of the Charcoal Toothpastes, Defendants made materially misleading representations and material omissions;

    b.    Whether Defendants made and breached an express warranty to Plaintiff and the Classes;

    c.    Whether TOM's' false and misleading statements concerning the Charcoal Toothpastes and its concealment of material facts concerning the Charcoal Toothpastes were likely to deceive reasonable consumers;

d.    Whether misrepresentations on the Charcoal Toothpastes caused consumers to pay a higher price than they otherwise would;

e.    Whether the acts and omissions of Defendants violated Section 349 or 350 of the New York General Business Law;

f.    Whether Plaintiff and the Classes are entitled to injunctive relief;

g.    Whether Defendants were unjustly enriched by the sale of the Charcoal Toothpastes and the profits earned therefrom should be disgorged; and

h.    Whether the actions of Defendants warrant punitive damages.

114.    Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce, on behalf of himself and the other Members of the proposed Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

115.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Classes because, among other things, all Members of the Classes were comparably injured through Defendants' uniform misconduct described above. Further, there are no defenses available to Defendants that are unique to Plaintiff or to any particular Members of the Classes.

116.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**: Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Members of the Classes it seeks to represent; it has retained counsel competent and experienced in complex class action litigation; and it will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and the undersigned counsel.

117.    **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Classes would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

118.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiff seeks to certify a Class to enjoin Defendants from selling or otherwise distributing the Products as labeled until such time that Defendants can demonstrate to the Court's satisfaction that the Products confer the advertised health or medicinal benefits.

119.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Members of the Classes to individually seek redress for Defendants' wrongful conduct.  Even if Members

of the Classes could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CAUSES OF ACTION**

**COUNT ONE**
**Violation of the State Consumer Fraud Acts**
**(On Behalf of the Consumer Fraud Multi-State Class)**

120.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

121.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

122.    Plaintiff and the other Members of the Consumer Fraud Multi-State Class have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class because Plaintiff and Members of the Consumer Fraud Multi-State Class have suffered an injury in fact and lost money as a result of Defendants' actions set forth herein.

123.    Defendants engaged in unfair and/or deceptive conduct by, *inter alia*, making misrepresentations that the TOM's Charcoal Toothpastes were safe for everyday use and that the TOM's Charcoal Toothpastes had safe whitening properties.

124.    Defendants intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class would rely upon their unfair and deceptive conduct and a

reasonable consumer would in face be misled by this deceptive conduct described above.

125.    Each of the Members of the Consumer Fraud Multi-State Class relied upon Defendants' unfair and deceptive conduct alleged herein in purchasing the TOM's Charcoal Toothpastes.

126.    As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class have sustained damagers in an amount to be proven at trial.

127.    In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT TWO**
**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq.***
**(In the Alternative to Count I and on behalf of the New York Sub-Class)**

128.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

129.    By reason of the acts set forth above, Defendants have been and are engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

130.    Defendants engaged in unfair and/or deceptive conduct by, *inter alia*, making the representations that the TOM's Charcoal Toothpastes can gently whiten and that they are safe for everyday use.

131.    The public is likely to be damaged because of Defendants' deceptive trade practices or acts. Specifically, Defendants' false, deceptive, or misleading statements implicate the health and safety of those consumers deceived by Defendants.

132.    Defendants direct their conduct at consumers, as Defendants' false, deceptive,

or misleading statements are contained in marketing targeted toward consumers, including social media and retail product packaging. As such, Defendants' conduct as alleged herein is consumer oriented.

133.   Defendants' deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

134.   Defendants' deceptive acts affect the public interest in the state of New York because, upon information and belief, consumers located in New York have purchased Defendants' Products in reliance on Defendants' false, deceptive, or misleading statements.

135.   As a result of Defendants' use of employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

**COUNT THREE**
**Violation of the New York Deceptive Trade Practice Act,**
**New York Gen. Bus. Law § 350, *et seq.***
**(In the Alternative to Count I and on behalf of the New York Sub-Class)**

136.   Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

137.   Defendants have made material, false or misleading statements or representations of fact about the Products. Specifically, Defendants have literally, impliedly, or by necessary implication made the representations that TOM's Charcoal Toothpastes were safe for everyday use and that the TOM's Charcoal Toothpastes had safe whitening properties, none of which are true.

138.   Defendants' acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

139.    The public is likely to be damaged because of Defendants' deceptive trade practices or acts. Specifically, Defendants' false or misleading statements implicate the health and safety of those consumers deceived by Defendants.

140.    As such, Defendants' conduct as alleged herein is consumer oriented.

141.    As a result of Defendants' material, false or misleading statements or representations of fact about the Products, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

**COUNT FOUR**
**Breach of Express Warranty**
**(On Behalf Of The National Class)**

142.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

143.    Plaintiff, and each member of the National Class, formed a contract with Defendants at the time Plaintiff and the other members of the National Class purchased the Products. The terms of the contract included the promises and affirmations of fact made by Defendants on the Charcoal Toothpastes' packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendants.

144.    Plaintiff and the National Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Charcoal Toothpastes.

145.    Defendants breached express warranties about the Charcoal Toothpastes and their qualities because Defendants' statements about the Charcoal Toothpastes were false and the Charcoal Toothpastes do not conform to Defendants' affirmations and promises as

described above.

146.    Had they known the true nature of the Charcoal Toothpastes, Plaintiff and each of the members of the National Class would not have purchased the Charcoal Toothpastes.

147.    As a result of Defendants' breach of warranty, Plaintiff and each of the members of the National Class have been damaged in the amount of the purchase price of the Charcoal Toothpastes and any consequential damages resulting from their purchases.

148.    On November 20, 2020, Plaintiff mailed a notice letter to Defendant Colgate and Defendant TOM's. The letter was sent on behalf of Plaintiff and all other persons similarly situated. Colgate responded to Plaintiff's letter on December 3, 2020 and rejected Plaintiff's allegations. Defendant TOM's received Plaintiff's notice letter on November 30, 2020. Defendant TOM's, through its attorney, also rejected the allegations set forth herein and failed to provide the relief, as requested by Plaintiff in his notice letter. After nearly three months of communications via e-mail and phone with Defendants, Plaintiff promptly filed this lawsuit promptly once he discovered that Defendants were not willing to provide the requested relief, as alleged in Plaintiff's notice letter and set forth in this Complaint.

**<u>COUNT FIVE</u>**
**Breach of Contract/Common Law Warranty**
**(On Behalf of the New York Sub-Class)**

149.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

150.    Plaintiff brings this cause of action on behalf of himself and the New York Sub-Class against Defendants.

151.    To the extent Defendants' commitment is deemed not to be a warranty under New York's Uniform Commercial Code, Plaintiff pleads in the alternative under common law

warranty and contract law.

152.    Plaintiff and New York Sub-Class Members purchased the Charcoal Toothpastes either directly from TOM's or through third-party retailers, both online and in brick-and-mortar stores.

153.    Defendants purport through their advertising and packaging to create express warranties and/or contract that the Charcoal Toothpastes are capable of gently whitening and are safe for everyday use.

154.    Defendants made the foregoing express representations and warranties and/or contract to all consumers, which became the basis of the bargain between Plaintiff, New York Sub-Class Members and Defendants.

155.    All conditions precedent to Defendants' liability under this warranty and/or contract were performed by Plaintiff and the New York Sub-Class when they purchased the Charcoal Toothpastes and used the Charcoal Toothpastes as directed.

156.    Defendants breached the warranties and/or contract about the Charcoal Toothpastes and their qualities because Defendants' statements about the Charcoal Toothpastes were false and the Charcoal Toothpastes do not conform to Defendants' affirmations and promises described above. Plaintiff and the New York Sub-Class Members would not have purchased the Charcoal Toothpastes had they known the true nature of the Charcoal Toothpastes and the misstatements regarding what the Charcoal Toothpastes were. This substantially and/or completely impairs the use and value of the Charcoal Toothpastes, which were not discoverable by Plaintiff and New York Sub-Class Members at the time of their purchase of the Charcoal Toothpastes.

157.    As a direct and proximate cause of Defendants' breach of warranty and/or

contract, Plaintiff and the New York Sub-Class Members were harmed because they would not have purchased the Charcoal Toothpastes if they had known the truth about the Charcoal Toothpastes.

158.    As a result of Defendants' breach of warranty and/or contract, Plaintiff and the New York Sub-Class have been damaged in the amount of the purchase price of the Charcoal Toothpastes and any consequential damages resulting from the purchases.

159.    On November 20, 2020, Plaintiff mailed a notice letter to Defendant Colgate and Defendant TOM's. The letter was sent on behalf of Plaintiff and all other persons similarly situated. Colgate responded to Plaintiff's letter on December 3, 2020 and rejected Plaintiff's allegations. Defendant TOM's received Plaintiff's notice letter on November 30, 2020. Defendant TOM's, through its attorney, also rejected the allegations set forth herein and failed to provide the relief, as requested by Plaintiff in his notice letter. After nearly three months of communications via e-mail and phone with Defendants, Plaintiff promptly filed this lawsuit promptly once he discovered that Defendants were not willing to provide the requested relief, as alleged in Plaintiff's notice letter and set forth in this Complaint.

## COUNT SIX
### Fraud
**(On Behalf of the Nationwide and/or Multi-State Class and/or the New York Sub-Class)**

160.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

161.    Plaintiff brings this cause of action on behalf of himself, the Nationwide Class and/or Multi-State Class and/or the New York Sub-Class against Defendants, Colgate and TOM's.

162.    As alleged herein, TOM's knowingly made material misrepresentations and

omissions regarding the Charcoal Toothpastes on the Charcoal Toothpastes' labeling and packaging in the Charcoal Toothpastes' advertisements, and/or on their website.

163.    TOM's made these material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Charcoal Toothpastes.

164.    TOM's did not inform consumers that the Charcoal Toothpastes are not capable of "gently" whitening teeth, and that they are not safe for everyday brushing; instead, TOM's' claims in marketing materials, as well as its marketing campaign for the Charcoal Toothpastes, suggests that the Charcoal Toothpastes are capable of "gently whitening" and that they are "safe for everyday use," in order to mislead consumers that the Products have those attributes.

165.    Defendants, Colgate and TOM's knew the Charcoal Toothpastes were not capable of "gently whitening" and that they were not "safe for everyday use", but nevertheless TOM's made such representations through the marketing, advertising, and on the Charcoal Toothpastes' labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Charcoal Toothpastes.

166.    Had Plaintiff and the Class known the truth about the Charcoal Toothpastes, they would not have purchased the Charcoal Toothpastes.

167.    As a proximate result of the fraudulent conduct of Defendants, Colgate and TOM's, Plaintiff and the putative Class paid monies to Defendants, through their regular retail sales channels, to which Defendants are not entitled, and have been damaged in an amount to be proven at trial.

**COUNT SEVEN**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and/or Multi-State Class and/or New York Subclass)**

168.    Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

169.    Plaintiff brings this claim against Defendants on behalf of himself and the New York Sub-Class.

170.    Plaintiff and the other Members of the New York Sub-Class conferred benefits on Defendants by purchasing the Charcoal Toothpastes.

171.    Defendants received the benefits to the detriment of Plaintiff and the other Members of the New York Sub-Class because Plaintiff and the other Members of the New York Sub-Class purchased mislabeled Charcoal Toothpastes that are not what they bargained for and that did not provide any of the promised benefits.

172.    Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Charcoal Toothpastes by Plaintiff and the other Members of the New York Sub-Class. Retention of those monies under these circumstances is unjust and inequitable because Defendants' labeling of the Charcoal Toothpastes was misleading to consumers, which caused injuries to Plaintiff and the other Members of the New York Sub-Class, because they would have not purchased the Charcoal Toothpastes had they known the true facts.

173.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the other Members of the New York Sub-Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other Members of the New York Sub-Class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class(es), pray for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendants bear the costs of any notice sent to the Class(es);

(c) Declare that Defendants must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendants to make full restitution to Plaintiff and the members of the Class(es);

(d) Awarding restitution and other appropriate equitable relief;

(e) Issuing an injunction against Defendants to enjoin them from conducting their business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

(f) A jury trial and damages according to proof;

(g) Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(h) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

(i) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(j) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Complaint.

Dated: March 5, 2021

Respectfully submitted,

*/s/ Jonathan Shub*
Jonathan Shub
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Highway East, 2nd
Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Spencer Sheehan
**SHEEHAN & ASSOCIATES, P.C.**
60 Cuttermill Rd, Suite 209
Great Neck, NY 11021
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the Proposed Class*